**Gail JOHNSON, et al., Appellants,**

v.

**SANDLER, BALKIN, HELLMAN & WEINSTEIN, P.C., and Lloyd Hellman, et al., Respondents.**

**No. WD 52426.**

Missouri Court of Appeals, Western District.

Nov. 10, 1997.

As Modified Dec. 23, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 23, 1997.

Application for Transfer Denied Jan. 27, 1998.

---

Martin M. Meyers, The Meyers Law Firm, Kansas City, for appellants.

Joseph H. Moore, Van Osdol, Magruder, Erickson & Redmond, Kansas City, for respondents.

Before ULRICH, C.J.,P.J., and BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, Judge.

Gail Johnson, Sandra Butler and Lori Baca brought a legal malpractice action against the law firm of Sandler, Balkin, Hellman, and Weinstein, P.C., and Lloyd Hellman, an individual attorney with that firm. Ms. Johnson, Ms. Butler, and Ms. Baca appeal the trial court's order entering summary judgment in favor of the attorneys.

The appellants contend that genuine issues of material fact exist regarding whether Mr. Hellman and the Sandler firm owed the appellants, as non-clients, a duty to ensure that provisions of a trust drafted by Mr. Hellman and the Sandler firm were effectuated. The appellants were beneficiaries of the trust provisions. This court finds that the appellants presented evidence which creates a genuine issue of material fact as to whether, during the course of an attorney-client relationship with the settlor of the trust, Mr. Hellman and the Sandler firm performed services specifically intended to benefit the appellants, and whether the attorneys breached their duty in the performance of those services. The summary judgment against the appellants on their claim for legal malpractice is reversed and the cause is remanded.

On appeal from an order granting summary judgment, this court views the evidence in a light most favorable to the non-movant. *ITT Commercial Finance v. Mid–Am. Marine*, 854 S.W.2d 371, 376 (Mo. banc 1993). Under that standard, the evidence is that Harry Adreme died on March 1, 1994. He was survived by his two daughters, Gail Johnson and Sandra Butler, and a granddaughter, Lori Baca, the child of Mr. Adreme's deceased daughter, Janice Katzberg. Mr. Adreme was also survived by his second wife, Donna Adreme, who bears no blood relation to either his daughters or granddaughter.

In 1981, Mr. Adreme executed a will and a revocable inter vivos trust. The trust was later amended five times. The original will and trust were prepared by attorney Larry Bold, who is not a party to this action. On Mr. Adreme's death, the trust would give Mr. Adreme's three daughters one-half of their father's estate, with each daughter re-

ceiving a one-third share. Ms. Baca was named as a co-beneficiary of her mother's third, and both of their interests were to be held in trust. The other half of Mr. Adreme's estate was to go to Mrs. Adreme. Mr. Adreme left half of his estate to his daughters to fulfill an obligation under a dissolution settlement with his first wife, the daughters' mother and Ms. Baca's grandmother.

In 1982, Mr. Adreme revoked and redrafted the trust's provisions relevant to this litigation by enacting the first-amended trust, which was also prepared by Mr. Bold. The first amendment revoked Mrs. Adreme's right to inherit one-half interest of the estate outright and replaced it with a Qualified Terminable Interest Property (QTIP) trust, with the net income payable to Mrs. Adreme for her lifetime and the remainder payable to his daughters and Ms. Baca.[1] In this amendment, Mr. Adreme increased his daughters' and Ms. Baca's interest under the trust by designating them as the residual beneficiaries of the QTIP trust upon Mrs. Adreme's death. By establishing a QTIP trust, Mr. Adreme ensured that, after his death and the death of Mrs. Adreme, the remainder of the QTIP trust would pass to the beneficiaries of his choice, rather than those chosen by Mrs. Adreme. The value of the QTIP trust exceeded $1.8 million. Thus, the daughters' and Ms. Baca's expectancy increased significantly as a result of the creation of the QTIP trust in the first amendment.

Mr. Adreme did not make any more changes to the trust until 1986, when he hired Mr. Hellman, an attorney with the firm of Sandler, Balkin, Hellman & Weinstein, to act as his general counsel. Between 1986 and 1992, Mr. Hellman and the Sandler firm drafted the second, third, fourth, and fifth amendments to the trust. Only the second and third amendments are relevant to this appeal.[2] In the second amendment, Mr. Adreme revoked the first amendment in its

entirety. Mr. Adreme did not change the interest of Mrs. Adreme, but substantially revised and redrafted the QTIP trust and the other provisions benefiting Ms. Johnson, Ms. Butler, Ms. Katzberg and Ms. Baca. In fact, the Sandler firm's billing statements charged Mr. Adreme for such services as "drafting of trust," "draft and dictate second amendment to trust," and "complete revision of trust amendment." These billing statements were addressed to Mr. Adreme only.

Mr. Hellman drafted the third amendment in 1989, after the death of Ms. Katzberg. In the third amendment, Ms. Baca was made the sole beneficiary of one-third of one-half of the proceeds of Mr. Adreme's estate and one-third of the residuary interest in the QTIP trust. Mr. Hellman made this change in accordance with Mr. Adreme's specific instructions that Ms. Baca receive her mother's share.

Mr. Hellman and the Sandler firm continued to represent Mr. Adreme until his death in 1994. At the time of his death, the overall effect of his testamentary plan was to divide his estate into two shares. His surviving daughters, Ms. Johnson and Ms. Butler, and his granddaughter, Ms. Baca, possessed three equal interests in the first share. The second share was held in a QTIP trust, the income payable to Mrs. Adreme for her life with the remainder passing to Ms. Butler, Ms. Johnson, and Ms. Baca in three equal parts.

Immediately following Mr. Adreme's death, Mrs. Adreme learned for the first time that there had been a significant alteration to her interest in the estate. It had been her understanding that she would receive one-half of the estate outright, free and clear of any trust. Mr. Hellman, however, explained to her that her interest would be held in trust with him and a bank acting as co-trustees. Shortly thereafter, Mrs. Adreme, represented by Mr. Hellman and the Sandler firm, filed a petition under Kansas law to

---

1. Under all of the amendments, one hundred thousand dollars of the principal of the QTIP trust is to be held in trust after Mrs. Adreme's death for her children until their thirtieth birthdays. The residuary interest of the appellants is the balance of the principal in the QTIP trust in excess of the one hundred thousand dollars.

2. The fourth and fifth amendments, drafted by the Sandler firm in 1992, did not affect the provisions of the trust which pertained to the appellants.

elect against Mr. Adreme's estate to take her spousal share, or one-half, of Mr. Adreme's estate. By electing against the trust, Mrs. Adreme effectively deprived the appellants of their remainder interest in the proceeds of the QTIP trust and, in doing so, defeated Mr. Adreme's expressed intent to benefit the appellants as residual beneficiaries of the QTIP trust.

Following Mrs. Adreme's election, the appellants jointly filed a two-count petition against Mr. Hellman and the Sandler firm. The first count was based on negligence and the second count was premised on a third-party-beneficiary claim for breach of contract. The appellants alleged that Mr. Hellman and the Sandler firm were guilty of legal malpractice because they failed to inform Mr. Adreme that an election against the trust by Mrs. Adreme was possible if he did not take steps to prevent it, and failed to advise him of his options under Kansas law to avoid her election. According to the appellants, due to Mr. Hellman and the Sandler firm's failure to properly inform Mr. Adreme regarding the possibility of the election, Mr. Adreme's testamentary plan was frustrated, and the appellants suffered the loss of their interest as the residual beneficiaries of the QTIP trust.

In response to this petition, Mr. Hellman filed a motion to dismiss or for summary judgment on the basis that the appellants lacked standing to bring a negligence or legal malpractice action against him and his firm. As part of his motion for summary judgment, Mr. Hellman included his own affidavit and the affidavit of Mrs. Adreme. In his affidavit, Mr. Hellman stated that in 1986, he was consulted by both Mr. and Mrs. Adreme about trust matters. Mr. Hellman said that, in compliance with Mr. Adreme's instructions, he and the members of his firm made only certain specific changes to the trust with each amendment. According to Mr. Hellman, neither he nor Mr. Adreme intended that these changes affect the distribution of Mrs. Adreme's or the appellants' shares of the trust. Mr. Hellman further averred that Mr. Adreme never specifically told him that the purpose of his services was to benefit the appellants. In effect, Mr. Hellman contend-

ed that the estate plan, if defective, originated in the first amendment prepared by Mr. Adreme's former attorney, Mr. Bold. Since the modifications made by Mr. Hellman in the second and third amendments did not change the interests of Mrs. Adreme or the appellants, Mr. Hellman asserts his services were not specifically intended to benefit the appellants.

In her affidavit, Mrs. Adreme stated that Mr. Hellman represented both her and Mr. Adreme, and that Mr. Adreme never asked Mr. Hellman to perform any services that would change the way the property was to be transferred to her upon his death. Mrs. Adreme said that she did not know prior to Mr. Adreme's death that her portion of her husband's estate was left to her in trust. She also averred that no one had asked her prior to Mr. Adreme's death to waive her statutory rights, and that had she been asked to waive her right to receive one-half of her husband's estate outright, she would have "absolutely refused" to do so.

In their suggestions in opposition to the motion for summary judgment, the appellants argued that there were several disputed factual issues regarding whether Mr. Hellman and the Sandler firm performed services which Mr. Adreme specifically intended would benefit the appellants. The appellants attached a copy of the second amendment to the trust, which contained notations highlighting the extensive changes made to the first amendment. They filed handwritten notes from Mr. Adreme's file at the law firm which outlined the beneficiaries of his estate, specifically his wife, his children and grandchildren, and his wife's children. There were also copies of two letters Mr. Hellman wrote in 1987 and 1989 to Mr. Adreme's first wife, Esther Adreme, which revealed his knowledge that the appellants were to receive one-half of the estate upon Mr. Adreme's death, and the remainder of the half of the estate held in trust upon Mrs. Adreme's death.

Additionally, the appellants presented portions of Mr. Hellman's deposition, in which he admitted he sent a letter to Mr. Bold in April of 1986 telling him that Mr. Adreme had retained his firm to act as general counsel for him, and he admitted that Mr.

Adreme specifically asked him to add Ms. Baca as a co-beneficiary to her mother's share of the trust. Mr. Hellman further stated in his affidavit that he was aware of the QTIP trust provision, and that because he represented both Mr. and Mrs. Adreme, a conflict of interest would have prevented him from obtaining from Mrs. Adreme a waiver of her right to elect against Mr. Adreme's will and trust. Mr. Hellman admitted that he did not recall performing legal services for Mrs. Adreme individually prior to Mr. Adreme's death, nor did he address any of the bills to her.

The appellants also attached to their suggestions in opposition to the motion for summary judgment an affidavit from their expert, a law school professor of trust and estate law and professional malpractice litigation. The expert reviewed the pleadings and Mr. Hellman's deposition, and opined that by choosing to use a QTIP trust, Mr. Adreme was selecting a method to ensure that after his death and Mrs. Adreme's death, the remainder of the QTIP trust would pass to the beneficiaries of his choice, rather than to those chosen by his wife. The expert further opined that Mr. Hellman and the Sandler firm undertook a total restatement of the QTIP provision and the other dispositional provisions in the trust and, in so doing, they assumed full professional responsibility for giving legal effectiveness to Mr. Adreme's intent to benefit the appellants in the QTIP trust and in the other dispositional provisions, regardless of whether their amendments restated an earlier amendment or were drafted anew. The expert then stated that Mr. Hellman and the Sandler firm's "failure to discuss with Mr. Adreme the possibility of an effective election against his trust and advise him of the alternatives open to him at the time of their representation falls below the standard of care for attorneys in practicing [sic] in the area of estates and trusts in this community."

The trial court granted the attorneys' motion for summary judgment, ruling that the appellants lacked standing to bring a legal malpractice action under the principles enunciated in the Missouri Supreme Court's decision in *Donahue v. Shughart, Thomson & Kilroy*, 900 S.W.2d 624 (Mo. banc 1995). In its order, the trial court found that Mr. Hell-man "did not perform services that were specifically intended to benefit these plaintiffs," that the portion of the trust at issue was drafted by Mr. Bold, and that the changes made to the trust by the defendants "in no way affected the remainder bequest to the plaintiffs ... nor were they retained to make any such changes." The trial court also dismissed the third-party-beneficiary claim based on *Donahue*'s finding that this type of claim was "merely one of attorney malpractice, clothed in a contract theory." The appellants filed a timely appeal of the summary judgment to this court. The appellants do not appeal the dismissal of the third-party-beneficiary claim.

In their sole point on appeal, the appellants contend that the trial court erred in entering summary judgment in favor of Mr. Hellman and the Sandler law firm because there was evidence that: (1) Mr. Adreme specifically asked Mr. Hellman to add Ms. Baca as a beneficiary to the trust and to ensure that Ms. Johnson and Ms. Butler received one-half of his estate; (2) in accordance with Mr. Adreme's instructions, Mr. Hellman made substantial revisions to the dispositional provisions of the trust; and (3) Mr. Hellman, having undertaken to prepare an amendment to the trust, assumed responsibility for effectuating the entire amendment, regardless of whether portions of the new amendment were restatements of earlier amendments. Further, they contend that *Donahue* grants them a cause of action because Mr. Adreme intended that Mr. Hellman's services in revising the trust benefit them.

■ The standard for appellate review of a summary judgment is *de novo*. *ITT*, 854 S.W.2d at 376. This court's criteria for ascertaining the propriety of summary judgment are the same as those which a trial court uses initially. *Id.* This court does not defer to the trial court's order granting summary judgment because the trial court's initial judgment is based on the record submitted and amounts to a decision on a question of law. *Id.* The moving party has the burden of establishing a right to judgment as a matter of law and that no genuine issue of material fact exists. *Id.* at 378.

■ Mr. Hellman was a defending party in this action. For a movant who is a defending party in a lawsuit, the prima facie showing required by Rule 74.04 is "necessarily different." *Id.* at 381. A defending party may establish a right to judgment as a matter of law by showing:

(1) facts that negate *any one* of the claimant's elements facts, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of *any one* of the claimant's elements, or (3) that there is no genuine dispute as to the existence of *each* of the facts necessary to support the movant's properly-pleaded affirmative defense.

*Id.*

When the movant has satisfied one of the three grounds for establishing a right to judgment, the non-movant is then required to respond by setting forth specific facts which show that there is a genuine issue of material fact. *Id.* Once a movant makes a prima facie showing, "an adverse party may not rest upon the mere allegations or denials of his pleading" to contradict facts alleged by the movant. *Id.* (quoting Rule 74.04(e)).

■ Here, the trial court's grant of summary judgment to Mr. Hellman and the Sandler law firm was based on a finding that they negated an element of the appellants' malpractice claim. The elements of a legal malpractice claim are: " '(1) that an attorney-client relationship existed; (2) that defendant acted negligently or in breach of contract; (3) that such acts were the proximate cause of the plaintiffs' damages; (4) that but for defendant's conduct the plaintiffs would have been successful in prosecution of their [underlying] claim.' " *Donahue*, 900 S.W.2d at 626 (quoting *Boatright v. Shaw*, 804 S.W.2d 795, 796 (Mo.App.1990)). Although the appellants were not clients of Mr. Hellman and the Sandler firm as required by the first element, they may still proceed with their legal malpractice claim if they qualify under the criteria set forth in *Donahue*, 900 S.W.2d at 628–29.

■ In *Donahue*, the Missouri Supreme Court adopted a rule permitting, under certain circumstances, a third party to have a cause of action for legal malpractice against an attorney who did not represent the third party. *Id.* The court created an exception to the traditional rule requiring privity in the form of the existence of an attorney-client relationship and allowed non-client beneficiaries of testamentary transfers to sue the donor's attorney for legal malpractice. *Id.* The court held that the element of a legal malpractice cause of action previously requiring the existence of an attorney-client relationship "may be satisfied by establishing as a matter of fact either that an attorney-client relationship exists between the plaintiff and defendant or an attorney-client relationship existed in which the attorney-defendant performed services specifically intended by the client to benefit plaintiffs." *Id.*

■ In its opinion, the *Donahue* court recognized two primary arguments against allowing a non-client to bring a legal malpractice action against an attorney. These concerns were that the liability could extend to an unlimited class of individuals and that liability will interfere with the attorney-client relationship. *Id.* at 628. To address these concerns, the court fashioned the following six-factor modified balancing test to determine whether an attorney owes a duty to a non-client plaintiff:

(1) the existence of a specific intent by the client that the purpose of the attorney's services were to benefit the plaintiffs.

(2) the foreseeability of the harm to the plaintiffs as a result of the attorney's negligence.

(3) the degree of certainty that the plaintiffs will suffer injury from attorney misconduct.

(4) the closeness of the connection between the attorney's conduct and the injury.

(5) the policy of preventing future harm.

(6) the burden on the profession of recognizing liability under the circumstances.

*Id.* at 629.

In *Donahue*, Gerald Stockton was entering a hospital for surgery, and he sent his attor-

ney checks payable to two individuals who were not beneficiaries under his living trust. *Id.* at 625. His attorney was directed to make sure that the two individuals received the proceeds of the checks when Mr. Stockton died. In addition, Mr. Stockton directed his attorney to prepare a deed which was to be effective on his death. Subsequently, Mr. Stockton gave his attorney another check and advised the attorney that he wanted one of the two individuals to receive the proceeds of that check on his death. After Mr. Stockton's death, the intended testamentary transfers were challenged in a declaratory judgment action and found invalid by the court of appeals. *Id.* The individuals who were to receive the checks and the deed filed suit against the attorney and his law firm for legal malpractice for their negligence in representing Mr. Stockton. *Id.* at 625–26.

The Supreme Court applied the six factors of its modified balancing test to these facts and found, as a matter of law, that they weighed in favor of imposing a legal duty on the attorneys to the non-client beneficiaries of Mr. Stockton's intended testamentary transfers. *Id.* at 629. Specifically, the court found:

> Applying these six factors here, the pleadings state that Stockton's primary purpose in writing the checks and preparing and signing the deed was to benefit the plaintiffs and, aside from Stockton's desire that his property be distributed according to his directions after his death, no benefit to him is apparent. It is clear that plaintiffs cannot be characterized as incidental or indirect beneficiaries. Negligent advice or preparation of testamentary documents was almost certain to cause plaintiffs injury. Future harm may only be prevented by allowing intended beneficiaries of failed testamentary transfers some avenue of recovery in malpractice claims, particularly where the estate has interests inconsistent with those of the intended beneficiaries. The legal profession will not be unduly burdened by being required to act competently toward identifiable persons that a client specifically intends to benefit when such persons have no other viable remedy and where such persons are not in an adversarial relationship to the client. The

Court concludes that the facts pleaded here are sufficient to assert a breach of a legal duty and to state a cause of action in a lawyer malpractice action.

*Id.*

Although the *Donahue* case involved the transfer of checks and a deed upon death, the Supreme Court talked in terms of a "failed testamentary transfer," and during its analysis of the balancing test referred to "negligent advice or preparation of testamentary documents." *Id.* Its use of these broad terms indicates that the Court's finding that a legal duty is owed by an attorney to a non-client who was the intended beneficiary of a failed testamentary transfer is equally applicable to support a finding of a legal duty to non-client beneficiaries of failed wills or trusts.

Applying *Donahue* to the facts of this case, this court must first determine whether there is sufficient evidence which, if true, would establish as a matter of fact that "an attorney-client relationship existed in which the attorney-defendant performed services specifically intended by the client to benefit the plaintiffs." *Id.* at 628–29. Then, as a separate matter, the question of legal duty of the attorneys to the appellants must be determined by weighing the factors in the modified balancing test. *Id.* at 629.

█ On the factual issue, and on the first factor under the test for a legal duty, the record must contain sufficient evidence that Mr. Adreme had an attorney-client relationship with Mr. Hellman and his firm and that he specifically intended for his attorneys' services to benefit Ms. Johnson, Ms. Butler and Ms. Baca. *Mark Twain Kansas City v. Jackson,* 912 S.W.2d 536, 539 (Mo.App.1995). There is no dispute that an attorney-client relationship existed between Mr. Hellman and his law firm and Mr. Adreme. In 1986, Mr. Adreme contracted with Mr. Hellman and the Sandler firm to provide legal services. Mr. Hellman's letter to Mr. Bold, Mr. Adreme's former attorney, requested all of Mr. Adreme's legal files because Mr. Adreme had hired Mr. Hellman and the Sandler firm to act as his general counsel. Mr. Hellman

and his firm represented Mr. Adreme up until his death in 1994.

The disputed issue is whether the services Mr. Hellman and the Sandler firm performed on Mr. Adreme's behalf were intended by him to benefit Ms. Johnson, Ms. Butler and Ms. Baca. There is no direct evidence that Mr. Adreme told Mr. Hellman or anyone else that he specifically intended that the amendments to the trust prepared by Mr. Hellman and the Sandler firm benefit the appellants. The only direct evidence of Mr. Adreme's intention comes from Mr. Hellman and Mrs. Adreme, and their testimony will not support such a conclusion. Nevertheless, Ms. Johnson, Ms. Butler, and Ms. Baca were specifically-named beneficiaries of the trust amendments, including the QTIP trust, which Mr. Hellman and the Sandler firm prepared. To satisfy *Donahue*, it is not necessary that the client advise the attorney drafting a will or a trust that he "intends to benefit" the beneficiaries. The main purpose of retaining an attorney to prepare a testamentary trust is to ensure the future transfer of the settlor's estate to the beneficiaries designated by the settlor. *See Lucas v. Hamm*, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685, 688 (1961), *cert. denied*, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); *Needham v. Hamilton*, 459 A.2d 1060, 1063 (D.C.App.1983). Therefore, an intent to benefit is inherent in designating persons as beneficiaries of a trust or will. *See Donahue*, 900 S.W.2d at 628–29. Mr. Adreme derived no benefit to himself from the establishment of the QTIP trust, "aside from [his] desire that his property be distributed according to his directions after his death." *Id.* at 629.

Mr. Hellman and the Sandler firm contend, however, that the scope of their representation of Mr. Adreme was so limited that they did not perform any services which affected the interests of the beneficiaries under Mr. Adreme's trust. They argue that the testamentary plan, if defective, was formulated by Mr. Bold who drafted the first amendment to the trust. When Mr. Hellman and the Sandler firm prepared the second amendment to Mr. Adreme's revocable inter vivos trust, they claim they did not change the interests or amounts that Mrs. Adreme

and the appellants would receive under the trust, so they had no duty to Mr. Adreme or his beneficiaries to effectuate the trust.

Mr. Hellman asserts that he was only hired to make very limited alterations to the trust agreement and that he did not discuss the QTIP provisions with Mr. Adreme. Mr. Hellman contends that he was engaged to make sure that the trust complied with the requirement of Mr. Adreme's dissolution decree that his children of his first marriage receive one-half of his estate, and to protect Mrs. Adreme's interest in her one-half interest in Mr. Adreme's estate. Specifically, Mr. Hellman claims the evidence shows that the scope of his representation was limited to making the following changes to Mr. Adreme's trust agreement, which did not affect or benefit Ms. Johnson, Ms. Butler, and Ms. Baca: (1) add Ms. Baca as co-beneficiary under her mother's share of the children's portion of the trust; (2) add himself as co-trustee, replacing Mr. Bold; (3) change the identity of the bank trustee; and (4) add an "ability to pay for life insurance" provision. He admits, however, that during the course of making the stipulated changes to the will and trust, he and the Sandler firm utilized the United Missouri Bank forms to rewrite the trust.

By his own admission, Mr. Hellman was instructed by Mr. Adreme, after Janice Katzberg's death, to make Ms. Baca the sole beneficiary of a one-third interest in one-half of the estate and in the residuary one-half after Mrs. Adreme's death. This evidences Mr. Adreme's specific intent to benefit Ms. Baca, which is sufficient to create a duty of Mr. Hellman and the Sandler firm to Ms. Baca. In addition, the actual work done by Mr. Hellman and his firm disputes Mr. Hellman's allegations that his representation was limited to the specific, minor modifications requested by Mr. Adreme. The testamentary instruments prepared by Mr. Hellman and his firm revoked the first amendment in its entirety and totally rewrote the testamentary provisions of the trust directly benefiting the appellants, including making substantial changes to the QTIP trust. Indeed, the Sandler firm billed Mr. Adreme for a "complete revision of trust amendment." There was no

evidence that the use of the United Missouri Bank forms was at Mr. Adreme's request, but rather there is the reasonable inference that the use of these forms was initiated by the law firm because, in the attorneys' analysis of Mr. Adreme's estate plan, the forms were deemed advantageous to effectuate Mr. Adreme's intent. In addition, the notes in Mr. Adreme's file at the law firm listing his beneficiaries indicate that consideration was given to his intended beneficiaries under his will and trust.

 This is evidence that Mr. Hellman and the Sandler firm undertook to make substantial revisions to the dispositional portions of Mr. Adreme's inter vivos trust, portions of which evidence Mr. Adreme's testamentary intent. If this evidence is believed, then the attorneys assumed a duty to effectuate that intent. Mr. Hellman and his firm assumed this duty regardless of whether Mr. Adreme directed them to completely restate the dispositional provisions of the trust. "Although there may be no duty to undertake a specific task, if an attorney does so voluntarily for a client, the task must be done with reasonable care." 1 RONALD E. MALLEN AND JEFFREY M. SMITH, LEGAL MALPRACTICE § 8.2, at 559 (4th ed.1996). They assumed full professional responsibility for the effectiveness of the amendment, regardless of whether the amendment was a restatement of an earlier provision or was drafted anew by them. Mr. Hellman and the Sandler firm contend that the amendment they drafted did not substantively change the dispositional portions of the trust drafted by Mr. Bold. If the work they were performing was merely that of scriveners, they had an obligation to advise Mr. Adreme of that fact, and there is no evidence that Mr. Hellman and the Sandler firm did so. *See Layton v. Pendleton*, 864 S.W.2d 937, 942 (Mo.App.1993); *see also* MALLEN AND SMITH, *supra*, § 8.3, at 566.

If the attorneys are found to have undertaken to rewrite Mr. Adreme's trust, then their duty included discussing with Mr. Adreme the possibility of an effective election against the trust, and advising him of alternative methods of transferring his property to accomplish his desired distributions. The appellants had evidence that had Mr. Hellman properly advised Mr. Adreme concerning Mrs. Adreme's possible exercise of her spousal share, he could have protected the appellants' residuary interest in the QTIP trust intended by Mr. Adreme. And, such a step could have been accomplished by drafting a waiver of the spousal right or by suggesting other testamentary schemes to accomplish his intent.

Mr. Hellman argues that he represented both Mr. Adreme and Mrs. Adreme and this dual representation supports his claim that he was not hired to perform any work intended to benefit the appellants. Again, the appellants presented evidence which disputes this allegation. First, Mr. Hellman sent all of the bills for his services and correspondence to Mr. Adreme only. Of greater significance, however, is the admission by Mrs. Adreme that she had no knowledge of her husband's testamentary plan until after his death. In her affidavit, Mrs. Adreme indicated that she was shocked when she learned that her interest in her husband's estate was encumbered by the QTIP trust and appellants' remainder interest. Her statement supports the reasonable inference that she was not a party to discussions concerning the amendments to Mr. Adreme's trust, contrary to her claim that Mr. Hellman was also representing her with regard to this matter.

Nor does the fact that Mr. Hellman may have represented both of the Adremes relieve him of his duty to effectively represent his clients' individual interests. Rule 1.7 of the Missouri Rules of Professional Conduct.[3] There was an inherent conflict between the

---

**3.** Rule 1.7 CONFLICT OF INTEREST: GENERAL RULE

\* \* \* \* \* \*

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected;

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

interests of Mr. and Mrs. Adreme under Mr. Adreme's estate plan, as Mrs. Adreme's interest in receiving her half of Mr. Adreme's estate outright was directly adverse to Mr. Adreme's interest in having his trust plan effectuated. If, in fact, Mr. Hellman was representing both of the Adremes, he was obligated to disclose the potential conflict of interest and determine if his clients desired to waive it. Rule 1.7. Obviously, Mr. Hellman and the Sandler firm did not obtain a consent from Mr. and Mrs. Adreme waiving the conflict, as Mrs. Adreme did not even know about the QTIP trust.

From the appellants' evidence, it is reasonable to infer that Mr. Adreme retained Mr. Hellman and the Sandler firm to handle his estate matters intending to benefit the appellants and that they undertook to substantially revise the first amendment to his trust. When they did this, they had the duty to ensure that they received his property in accordance with his testamentary scheme. Part of Mr. Adreme's testamentary scheme, according to the trust agreement, was the designation of the appellants as residual beneficiaries of the QTIP trust, valued at more than $1.8 million. As such, the appellants directly and specifically benefited from any actions taken by Mr. Hellman to ensure the QTIP trust was effective and cannot be characterized as incidental or indirect beneficiaries of Mr. Hellman's services.

The evidence of the parties creates a genuine dispute of material fact as to whether Mr. Adreme intended the services performed by Mr. Hellman and his firm to benefit Ms. Johnson, Ms. Butler and Ms. Baca. And, the evidence relevant to the first factor of the *Donahue* test weighs in favor of imposing a legal duty on the attorneys. It is not necessary for this court to analyze each of the remaining factors. The court in *Donahue* found that the remaining factors weighed in favor of finding that an attorney who advised and prepared testamentary documents for a client owed a legal duty to the intended beneficiaries of the testamentary transfers. 900 S.W.2d at 629. Based upon this finding in *Donahue*, and viewing the evidence in this case in the light most favorable to the appellants, this court also finds that the remaining factors weigh in favor of finding that Mr. Hellman and the Sandler firm owed a duty to the appellants. Therefore, the appellants presented sufficient evidence that the attorneys owed a duty to the non-client appellants under *Donahue*.

Having found that the appellants satisfied the first element of a legal malpractice claim, this court now turns to the second element and considers whether there was evidence that Mr. Hellman and the Sandler firm acted negligently or in breach of contract. As previously found, when a lawyer undertakes to revise the testamentary scheme of a client, the lawyer should be aware of the potential injury the intended beneficiaries of the testamentary scheme would suffer as a result of any negligence of the lawyer. Once Mr. Hellman and the Sandler firm undertook to restate the dispositional portions of Mr. Adreme's trust and the amendments thereto, portions which evidence Mr. Adreme's intent, they assumed a duty to effectuate that intent. Mr. Hellman and his firm assumed this duty regardless of whether Mr. Adreme asked them to completely restate the dispositional provisions of the trust. There was evidence from the appellants' expert witness that Mr. Hellman and the Sandler firm's "failure to discuss with Mr. Adreme the possibility of an effective election against his trust and advise him of the alternatives open to him at the time of their representation falls below the standard of care for attorneys in practicing [sic] in the area of estates and trusts in this community." This is sufficient evidence to preclude a grant of summary judgment on the second element.

Under the third element of a legal malpractice claim, there was sufficient evidence that Mr. Hellman's conduct was the proximate cause of the appellants' injury. Mr. Adreme had entrusted Mr. Hellman with the preparation of amendments to the trust document in order to effectuate his intent of granting the appellants the residuary interest in the QTIP trust granted to Mrs. Adreme. Mr. Adreme, as a lay person, would not know what steps were needed to protect the appellants' remainder interest and to prevent Mrs. Adreme from nullifying his intent by exercising her right to a spousal

share. A layperson most likely would not even be aware of the right to an elective share or what effect the exercise of that right would have on testamentary intent.

Foreseeability is also a prominent factor in the proximate cause analysis. *Krause v. U.S. Truck Co., Inc.,* 787 S.W.2d 708, 710 (Mo. banc 1990). Had Mr. Hellman properly advised Mr. Adreme concerning Mrs. Adreme's possible exercise of her spousal share, he could have protected the appellants' residuary interest in the QTIP trust intended by Mr. Adreme. It is clear here, as in *Donahue,* that the appellants "cannot be characterized as incidental or indirect beneficiaries" of Mr. Hellman's actions. *Donahue,* 900 S.W.2d at 629. Ms. Johnson, Ms. Butler and Ms. Baca were the sole beneficiaries of one-half of the proceeds of Mr. Adreme's estate and had a residuary interest in the other half, worth $1.8 million, which was to become vested at the time of Mrs. Adreme's death. It was certainly foreseeable that the appellants would be harmed if they were deprived of their remainder interest in the $1.8 million trust by Mrs. Adreme's exercise of her spousal election. Likewise, it was foreseeable that the appellants would suffer this harm if Mr. Hellman negligently failed to advise Mr. Adreme that Mrs. Adreme could easily defeat his intent by electing to take her spousal share of his estate.

As for the final element of a legal malpractice claim, there was sufficient evidence that but for Mr. Hellman's and the Sandler firm's failure to advise Mr. Adreme of the spousal election, the appellants would have received their remainder interest in the $1.8 million trust that Mr. Adreme had intended they receive. Mr. Hellman and the Sandler firm contend that this element is a "fatal flaw" in the appellants' claim because even if Mr. Hellman had advised Mr. Adreme about the possibility of the spousal election, there is no evidence that Mr. Adreme would have asked Mrs. Adreme to waive the spousal election, and there was affirmative evidence from Mrs. Adreme that she would not have waived it. The appellants presented evidence, however, that the waiver was not the only option available to Mr. Adreme if he had been advised of the potential problem in effectuating his tes-

tamentary intent. The appellants alleged that under Kansas law, Mr. Adreme could have created an irrevocable QTIP trust or a joint tenancy with right of survivorship to the appellants in order to defeat Mrs. Adreme's right of election. To support their assertion that other options were available to Mr. Adreme, the appellants cited, *inter alia,* John F. Kuether & Willard B. Thompson, *The Capricious Operation of the Kansas Elective Share: Feast or Famine for the Surviving Spouse,* 62 J. Kan. B. Ass'n 32 (1992). Mr. Hellman and the Sandler firm did not challenge the availability or the effectiveness of these options under Kansas law. Instead, Mr. Hellman and the Sandler firm criticized the authority because it was not available during the relevant time period and contended that neither of these alternatives would have been palatable to Mr. Adreme. In reviewing an appeal from summary judgment, this court reviews the evidence in the record before the trial court. *ITT,* 854 S.W.2d at 376. This court is to focus not on the truth of the facts presented by appellants, but instead on whether those facts were disputed. *Id.* at 382. Mr. Hellman and the Sandler firm failed to negate the element of appellants' claim that but for Mr. Hellman's conduct of failing to advise Mr. Adreme of the spousal election, they would not have lost their interest in the residuary of the $1.8 million QTIP trust.

The evidence in the record demonstrates the existence of genuine issues of fact regarding whether Mr. Adreme specifically intended to benefit the appellants by retaining Mr. Hellman and his firm to handle his estate matters, and whether Mr. Hellman and the Sandler law firm breached their duty to Mr. Adreme and, under *Donahue,* to the appellants. From the evidence in the record, the finder of fact could reasonably conclude that Mr. Adreme hired Mr. Hellman to revise his estate plan and intended to benefit the individuals named in the revised trust. The finder of fact could also conclude that Mr. Hellman was negligent in failing to advise Mr. Adreme about the possibility of the spousal election and that this negligence directly caused the appellants harm. There are two "plausible, yet contradictory" accounts of the facts essential to the claimants'

case. In light of this evidence, summary judgment was improper.

The judgment of the trial court is reversed as to the appellants' claim of legal malpractice, and the cause is remanded for proceedings consistent with this opinion.

All concur.